UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,


                              Plaintiff,

                                                    PRELIMINARY ORDER
                                                    OF FORFEITURE

                                                    05-CR-6161L


               v.

JOHN NICOLO,
DAVID FINNMAN,

                         Defendants.
_____


**INTRODUCTION**


        Defendants John Nicolo and  David Finnman were convicted after trial of multiple counts

involving conspiracy, mail and wire fraud, and money laundering.  The indictment also contained

two forfeiture allegations, the "First Forfeiture Allegation" relating to the money laundering

convictions and a "Second Forfeiture Allegation" relating to the fraud counts.  *See* Third

Superseding Indictment (Dkt. #70) at 174-79.  The parties stipulated before trial that the Court

would determine forfeiture issues subsequent to the jury's verdict and prior to sentencing.  The

government now moves for a preliminary order of forfeiture as to both defendants Nicolo and

Finnman pursuant to Rule 32.2(b) of the Federal Rules of Criminal Procedure.[1]

In describing criminal forfeiture statutes, one commentator has noted that they are

"complex" and "labyrinthine."[2]  That may be so, but in this case it is clear and quite

straightforward that defendant John Nicolo fraudulently received millions of dollars as a direct

result of engaging in criminal activities over a period of years, involving a conspiracy to commit

honest services fraud, mail and wire fraud and money laundering.

As part of the sentencing process, the government seeks to divest Nicolo of his ill-gotten

gains, by means of an order directing the forfeiture of Nicolo's interests in certain assets.

Specifically, the government seeks, under Rule 32.2(b)(1), a preliminary order of forfeiture as to

several bank accounts, vehicles, and two parcels of real property in New York and Florida, as

well as an *in personam* judgment against Nicolo in the sum of $9,729,264.[3]

As to defendant Finnman, the government seeks only an *in personam* forfeiture money

judgment in the amount of $385,393.  The government does not seek forfeiture of any specific

item of personal or real property as to Finnman.

---

[1]Codefendant, Charles Schwab, as part of his plea agreement, agreed to entry of a preliminary order of forfeiture as to the bulk of his assets, both real and  personal.

[2]Heather J. Garretson, "Federal Criminal Forfeiture:  A Royal Pain in the Assets," 18 S. Cal. Rev.  L. & Soc. Just., 45, 46, 48 (Fall 2008).

[3]That amount is $30,000 more than the amount originally stated in the government's motion.  *See* Dkt. #336 at 44.  In a letter to the Court filed on February 13, 2007, the government states that its original motion papers contained a typographical error incorrectly listing one component of the amount sought to be forfeited as $40,000, rather than the correct amount of $70,000.

In addition to relying on the evidence at trial, the government has submitted, as Exhibit A to its motion, an affidavit of Daniel Ciavarri, a financial analyst employed by the Federal Bureau of Investigation ("FBI").  Ciavarri performed a financial analysis of the various bank accounts owned by defendant Nicolo and his wife, codefendant Constance Roeder.  In addition, the government and defendants have submitted legal memoranda in support of their respective positions.  In their submissions, counsel for both Nicolo and Finnman have raised a host of arguments in opposition to the government's forfeiture motion.  The Court entertained extensive oral argument on the government's motion on December 8, 2008.

Based on the evidence at trial and the criminal convictions which followed, I find that the government has met its burden, and I therefore grant the motion and issue a preliminary order of forfeiture.  An *in personam* judgment will be entered against both defendants Nicolo and Finnman.   Defendant John Nicolo, by virtue of this order, also forfeits his interest in the property herein described, for the following reasons.

## DISCUSSION

### I. Statutory Framework

The government seeks forfeiture under two separate, but similar, federal statutes.  The Second Forfeiture Allegation seeks forfeiture of a total sum of over $9.7 million from Nicolo as proceeds of the various fraud-related crimes of which he was convicted.  Forfeiture of that amount is sought pursuant to 18 U.S.C. § 981(a)(1)(C), as well as 28 U.S.C. § 2461(c), which together provide for forfeiture of property "which constitutes or is derived from proceeds

traceable" to a violation of certain statutes "or any offense constituting 'specified unlawful activity'." 18 U.S.C. § 981(a)(1)(C).[4]  Violations of the mail and wire fraud statutes constitute "specified unlawful activity."  *United States v. Funds Held in the Name or for the Benefit of Wetterer*, 210 F.3d 96, 103 (2d Cir. 2000); *see also* 18 U.S.C. §§ 1956(c)(7), 1961(1).

In addition, as to the First Forfeiture Allegation concerning the substantive money laundering convictions and the conspiracy to commit money laundering, the government relies on 18 U.S.C. § 982(a)(1), which subjects to forfeiture "any property, real or personal, involved in such offense, or any property traceable to such property."

Although defendants oppose the government's motion for a preliminary order of forfeiture, there is little dispute as to the applicable standards that control the Court's decision. Deciding a motion for a preliminary order of forfeiture is part of the sentencing process.  As such, the rules of evidence that must be followed in criminal trials do not apply to this proceeding.  *See United States v. Capoccia*, 503 F.3d 103, 110 (2d Cir. 2007); *United States v. Gaskin*, No. 00-CR-6148, 2002 WL 459005, at *9 (W.D.N.Y. Jan. 8, 2002), *aff'd*, 364 F.3d 438 (2d Cir. 2004), *cert. denied*, 544 U.S. 990 (2005).  The Court's determination of what, if any, property is subject to forfeiture may be based on evidence already in the record from the trial or as submitted in the sentencing proceeding.  *Capoccia*, 503 F.3d at 109-10.  The government has the burden of proof to establish the propriety of forfeiture by a preponderance of the evidence.

---

[4]Although § 981 authorizes only civil forfeitures, the forfeitable property it describes is made subject to criminal forfeiture as well, through § 16 of the Civil Asset Forfeiture Reform Act of 2000 § 16, 28 U.S.C. § 2461(c).  *See United States v. Schlesinger*, 514 F.3d 277, 278 (2d Cir. 2008) (per curiam); *United States v. Capoccia*, 503 F.3d 103, 115 (2d Cir. 2007); *United States v. Vampire Nation*, 451 F.3d 189, 199-200 (3d Cir.), *cert. denied*, 549 U.S. 970 (2006).

*United States v. Schlesinger,* 396 F. Supp.2d 267, 271 (E.D.N.Y. 2005) *aff'd,* 514 F.3d 277 (2d Cir. 2008).

As to Nicolo, consideration of the forfeiture issues has been clouded somewhat because most of the personal and real property at issue is titled not to Nicolo but to his wife, codefendant Constance Roeder.  No order of forfeiture is sought against her.[5]  It is important, therefore, to underscore the limited task before the Court on this motion.  The Court's task at this juncture is not to consider and resolve the potentially thorny issues concerning third-party ownership of the property sought to be forfeited.  Those issues are for another day.

Rather, the Court's obligation at this stage is primarily to determine the nexus or connection between the crime of conviction and the property sought to be forfeited.  The requisite nexus can be established, and the property forfeited, if the property was:  "involved in" the underlying offense; is "traceable to" property that was involved in the offense; constitutes "proceeds" of the offense; or is "derived from" proceeds of the offense.  *Capoccia*, 503 F.3d at 117.  If the government succeeds in establishing such a nexus, then *Nicolo's* interest in that property may be ordered forfeited.

Once the Court enters the preliminary order of forfeiture as to Nicolo, then, if a third party claims an interest in the property designated for forfeiture, the Court will consider such claims and render a final determination at an ancillary proceeding, as authorized by Rule 32.2(c).

---

[5]Roeder is named as a defendant only in the tax counts, not in any of the fraud or money laundering counts.

Those proceedings may be and usually are conducted well after imposition of sentence and entry of the Judgment and Commitment.[6]

With respect to mail and wire fraud, property is subject to forfeiture if it "constitutes or is derived from proceeds traceable to" a fraud violation.  18 U.S.C. § 981(a)(1)(C).  The term "proceeds" is defined, in pertinent part, as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."  18 U.S.C. § 981(a)(2)(A).  To put it another way, "[p]roceeds are property that a person would not have but for the criminal offense ... ."  *United States v. Grant*, No. S4 05 CR 1192, 2008 WL 4376365, at *2 n. 1 (S.D.N.Y. Sept. 25, 2008); *accord United States v. Evanson*, No. 2:05 CR 00805, 2008 WL 3107332, at *3 (D.Utah Aug. 4, 2008); *see*, *e.g.*, *United States v. Zvi*, 168 F.3d 49, 52 (2d Cir.) (permitting forfeiture of funds legitimately obtained through defendants' sale of gold jewelry prior to the commission of fraud involving faked robbery of jewelry store, because "[t]he

---

[6]Rule 32.2(b)(3) provides that "[a]t sentencing ... the order of forfeiture becomes final as to the defendant and must be made a part of the sentence and be included in the judgment."  Such forfeiture orders, then, are often referred to as "final" orders of forfeiture.

As the Third Circuit explained in *United States v. Bennett*, 423 F.3d 271 (3d Cir. 2005), however,

> there is also a second kind of "final order of forfeiture."  Forfeiture may involve ancillary proceedings in which the rights of third parties to the forfeited property are adjudicated; when the ancillary proceedings are concluded, then the court enters a "final order of forfeiture by amending the preliminary order as necessary to account for any third-party rights."

*Id.* at 275 n. 1 (quoting Fed. R. Crim. P. 32.2(c)(2)).  Thus, although the Court's preliminary order of forfeiture will become "final" as to Nicolo at the time of his sentencing, it could be followed by a second, amended final order of forfeiture following any ancillary proceedings.

proceeds from the pre-robbery sale of gold represented the defendants' take from the scheme"),
*cert. denied*, 528 U.S. 872 (1999)

With respect to forfeiture of fraud proceeds under § 981, then, a defendant may be
ordered to forfeit all monies received by him as a result of the fraud, regardless of his net profits
from the scheme. *See, e.g.*, *United States v. Uddin*, ___ F.3d ___, 2009 WL 23606, at *4 (2d Cir.
Jan. 6, 2009) (where defendant was convicted of food stamp fraud, district court did not err by
entering forfeiture order equal to amount of government's entire loss, regardless of whether
defendant shared the cash that he fraudulently received from the government with the food stamp
beneficiary, since fraud "'proceeds' are not limited to net profits from the crime").

Consistent with that principle, it is irrelevant, for forfeiture purposes, whether a defendant
convicted of fraud in connection with a kickback scheme actually performed any of the services
that he contracted to perform as a result of the scheme. Again, monies paid to a defendant as a
result of the scheme are "proceeds" subject to forfeiture, without regard to whether the victim
received anything in return. *See United States v. Webber*, 536 F.3d 584, 603 (7th Cir. 2008)
(explaining that since "[r]estitution is remedial in nature, and its goal is to restore the victim's
loss," whereas forfeiture is punitive and "seeks to disgorge any profits that the offender realized
from his illegal activity[,] ... restitution is calculated based on the victim's loss, while forfeiture is
based on the offender's gain"); *see, e.g.*, *United States v. 10150 NW 133 St.*, 278 Fed.Appx. 880,
883 (11th Cir. 2008) (whether defendant Medicare provider actually filled medically necessary
prescriptions pursuant to kickback scheme was irrelevant, since "[t]he kickbacks that led to the
[Medicare] claims made them fraudulent, so the money paid for the claims is the proceeds of a
crime").

To the extent that Nicolo received payments from the fraud victims as a result of the charged schemes, then, those payments are forfeitable, regardless of whether he performed any work pursuant to the contracts.  Nicolo's performance, if any, may be relevant to the victims' loss, and hence to a future order of restitution,[7] but it is irrelevant to the amount of his proceeds. *See* 18 U.S.C. § 981(a)(2)(A); *Advance Pharmaceutical, Inc. v. United States*, 391 F.3d 377, 400 (2d Cir. 2004) (finding no abuse of discretion in district court's forfeiture award based on gross, rather than net, profits in RICO case); *United States v. Lizza Indus., Inc.*, 775 F.2d 492, 498 (2d Cir. 1985) ("proceeds" are gross profits), *cert. denied*, 475 U.S. 1082 (1986).  Ordering Nicolo to disgorge the full amount of his proceeds, irrespective of any loss to the victim, is consistent with the punitive purpose of criminal forfeiture.  *See Pacheco v. Serendesky*, 393 F.3d 348, 355 (2d Cir. 2004) (noting that the purposes of criminal forfeiture are "to punish, deter and disempower criminals").

Criminal forfeiture based on money laundering violations differs in some respects from fraud-based forfeiture.  As stated, 18 U.S.C. § 982(a)(1) subjects to forfeiture any property "involved in" a money laundering offense, or any property "traceable to such property."  "The term 'involved in' has consistently been interpreted broadly by courts to include any property involved in, used to commit, or used to facilitate the money laundering offense."  *Schlesinger*, 396 F.Supp.2d at 271 (S.D.N.Y. 2005) (collecting cases).  *See also United States v. Reiner*, 397 F.Supp.2d 101, 112 (D.Me. 2005) (noting authority that "the standard for determining what funds are 'involved in' a money laundering offense is less demanding than that for establishing

---

[7]By order entered February 12, 2009 (Dkt. #422), the Court deferred the final determination on restitution pursuant to the provisions of 18 U.S.C. § 3664.

- 8 -

'proceeds'" of a crime under § 981(a)(1)) (citing *United States v. McGauley*, 279 F.3d 62, 76-77 (1st Cir. 2002)).

Forfeiture based on a defendant's money laundering, then, is appropriate not only with respect to the laundered monies themselves, but also with respect to property that is used to commit or facilitate the offense.  "Facilitation occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance."  *United States v. Wyly*, 193 F.3d 289, 302 (5th Cir. 1999) (quoting *United States v. Tencer*, 107 F.3d 1120, 1134 (5th Cir.), *cert. denied*, 522 U.S. 960 (1997)).

"[P]roperty 'traceable to' means property ... the acquisition [of which] is attributable to the money laundering scheme rather than from money obtained from untainted sources."  *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998), *cert. denied*, 528 U.S. 1139 (2000).  *See also United States v. Voigt*, 89 F.3d 1050, 1084-87 (3d Cir.) ("We hold that the term 'traceable to' means exactly what it says," *i.e.*, "that the property ... has *some* nexus to the property 'involved in' the money laundering offense"), *cert. denied*, 519 U.S. 1047 (1996).

In *Voigt*, the Court of Appeals for the Third Circuit illustrated the difference between "involved in" and "traceable to" through the following example:

> if the defendant receives $500,000 cash in a money laundering transaction and hides the cash in his house, the government may seize that money as property "involved in" the money laundering offense.  If the defendant purchased a $250,000 item with that money, the government may seek the remaining cash as "involved in" the offense, whereas the item purchased is subject to forfeiture as property "traceable to" property involved in the money laundering offense.

*Voigt*, 89 F.3d at 1087.

It is also important to keep in mind the different types of money laundering offenses of which Nicolo has been convicted.  Counts 33 and 34 of the Third Superseding Indictment charged Nicolo with engaging in a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h).  Specifically, those counts charge Nicolo with conspiring to engage in violations of 18 U.S.C. § 1956(a) and § 1957.[8]  The other nineteen money laundering counts here charged Nicolo with substantive violations of § 1957.

While §§ 1956(a) and 1957 both generally fall under the rubric of "money laundering," there are significant differences between the two.

> Section 1956 ... prohibits money laundering as that activity is commonly understood. Section 1956 punishes conducting a financial transaction with the proceeds of specified unlawful activity knowing that the transaction is designed to conceal or disguise the nature, location, source, ownership or control of the proceeds, or intending that the transaction be so designed.  Section 1957, on the other hand, prohibits engaging in

---

[8]Section 1956(a) provides, in pertinent part:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity–

\* \* \*

(B) knowing that the transaction is designed in whole or in part–

(I) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity;

\* \* \*

shall be [guilty of a crime].

Section 1957 provides, in pertinent part, that "[w]hoever ... knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be [guilty of a crime]."

> monetary transactions in property from specified unlawful activity, and contains no
> requirement that the transaction be designed to conceal anything. A defendant must know
> only that she is engaging in a transaction and that the subject of the transaction is
> criminally derived property.

*United States v. Allen*, 129 F.3d 1159, 1164-65 (10th Cir. 1997). *See also United States v. Brown*,
186 F.3d 661, 670 (5th Cir. 1999) (§ 1957 criminalizes the "mere spending of dirty money");
*United States v. Rutgard*, 116 F.3d 1270, 1291 (9th Cir. 1997) (§ 1957 "applies to the most open,
above-board transaction. The intent to commit a crime or the design of concealing criminal fruits
is eliminated"); *United States v. Wynn*, 61 F.3d 921, 927 (D.C. Cir.) ("Due to the omission of a
'design to conceal' element, section 1957 prohibits a wider range of activity than money
'laundering,' as traditionally understood"), *cert. denied*, 516 U.S. 1015 (1995). Unlike § 1956,
however, § 1957 requires that the property involved have a value greater than $10,000. 18
U.S.C. § 1957(a).


## II. Forfeiture Concerning Defendant Nicolo

As to Nicolo, the government seeks a judgment in the approximate amount of $9.7
million, as well as the forfeiture of specific items of property which the government claims
should be utilized to satisfy the $9.7 million judgment.

The specific items of real and personal property are listed in the First Forfeiture
Allegation, at pages 175-76 of the Third Superseding Indictment, and at page 44 of the
government's motion for a preliminary order of forfeiture. They include monies in six different
bank accounts or CD accounts, three automobiles and two parcels of real property, one in Penn
Yan, New York and the other in Palm Beach, Florida. Pursuant to seizure warrants issued well

before trial, all of the accounts and personal property have been seized by the government, and liens have been filed against the real property.

## A. Forfeiture of Fraud Proceeds

As explained above, monies received by Nicolo that represent his gross proceeds of the fraud offenses of which he was convicted are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). *Uddin*, ___ F.3d ___, 2009 WL 23606, at *4; *Lizza Indus., Inc.*, 775 F.2d at 498. Indeed, Nicolo does not appear to dispute that general principle; his response in opposition to the government's motion for a preliminary order of forfeiture is devoted almost entirely to arguing that the government has not satisfied its burden to show that particular items of property seized from *Roeder* are subject to forfeiture.  Nicolo's brief discussion of his own seized assets simply argues that the government has not sufficiently traced those assets to forfeitable funds.

The evidence at trial established that Nicolo was paid $8,272,806 by two of the victims of the fraud, Eastman Kodak Co. ("Kodak") and ITT Space Industries, pursuant to performance-based contracts entered into by the victims and Nicolo (or companies that were owned by him and under his direction and control) as a direct result of the kickback scheme.  The evidence also showed that Nicolo did essentially no work under those contracts, and that the performance fees (which were tied to tax assessment reductions on the victims' real properties) paid to Nicolo were not legitimately earned.  Some of the contracts, for example, were backdated to make it appear that Nicolo's assessments had resulted in a reduction of the victims' property tax

assessments, when in fact those assessments had already been reduced, for reasons having nothing to do with any assessments performed by Nicolo.[9]

Nicolo was also paid a total of $2,230,512.41 under a number of fixed-fee, *i.e.*, non-performance-based, contracts with Kodak.  Nicolo actually did prepare assessments pursuant to these contracts, but he also "kicked back" $1,001,065 of those payments to Mark Camarata, a Kodak employee, as payment for awarding the contracts to Nicolo.  With respect to those contracts, the government seeks forfeiture in this proceeding only of the amount of the kickbacks paid to Camarata.[10]

In accordance with the principles recited above, the government is entitled to forfeiture of the entire amounts paid to Nicolo by the victims under the performance-based contracts, *i.e.*, $8,272,806.  That amount constitutes "property that [Nicolo] would not have [received] but for the criminal offense ... ."  *Grant*, 2008 WL 4376365, at *2.

The government is also entitled to forfeiture of the roughly $1 million paid by Nicolo to Camarata in kickbacks for the fixed-fee contracts.  Although that amount does not represent net profit from Nicolo's perspective, it was nevertheless part of the proceeds of the crime (as well as loss to the victim Kodak), and, as stated, the appropriate measure of forfeiture in the Second

---

[9]With respect to some of these contracts, involving real property in the Town of Greece, New York, this was accomplished because Charles Schwab, the then-tax assessor for the Town of Greece, was also involved in the scheme and pocketed well over a million dollars in bribes and improper payments.

[10]At oral argument on the government's forfeiture motion, counsel for the government stated, in effect, that the government could have sought forfeiture of the entire $2.2 million paid to Nicolo under the fixed-fee contracts, but chose instead to seek only the $1 million in kickbacks to Camarata, and that the government is "going to ask for that extra 1.2 [million] in restitution ... ."  Transcript, Dec. 8, 2008 (Dkt. #410) at 43 lines 2-3.

Circuit is the defendant's *gross* proceeds.  *Advance Pharmaceutical*, 391 F.3d at 400; *see also*

*United States v. Genova*, 333 F.3d 750, 754, 761 (7th Cir. 2003) (even though Seventh Circuit

calculated forfeiture amount based on defendant's net proceeds, defendant attorney was subject

to forfeiture of amount of kickbacks that he paid to city mayor in return for "get[ting] the lion's

share of the City's legal business," since attorney and mayor, "as partners in crime, [we]re jointly

and severally liable for the forfeitable proceeds of their activities") (Easterbrook, J.).


**B. Money Laundering Forfeiture**

In addition to the proceeds of Nicolo's fraud offenses, the government is also entitled to

forfeiture of all property that was either involved in the money laundering offenses of which

Nicolo was convicted, or which is traceable to such property.  18 U.S.C. § 982(a)(1).  Title to

such property vested in the United States at the time that the underlying offense was committed.

*See* 21 U.S.C. § 853(c) (incorporated by 18 U.S.C. § 982(a)(1)); *see also United States v.*

*Lazarenko*, 476 F.3d 642, 647 (9th Cir. 2007).

As stated, there are two types of money laundering violations alleged here.  Counts 35

through 53 of the third superseding indictment charged Nicolo (who was found guilty on all of

the charges against him) with a violation of 18 U.S.C. § 1957.  That is the "money spending

statute" that criminalizes the "mere spending" of criminally derived property with a value greater

than $10,000, with knowledge of the unlawful source, regardless of any intent to conceal the

nature of the property.  *Brown*, 186 F.3d at 670 & n. 16.  Thus, to the extent that Nicolo engaged

in any transactions with the proceeds of his fraudulent activities, in amounts greater than

$10,000, those transactions constituted violations of § 1957.

In addition, Counts 33 and 34 charged Nicolo with engaging in a conspiracy to launder money, in violation of § 1956(h).[11]  Count 33 charged Nicolo with conspiring with Camarata to violate both §§ 1956 and 1957, and Count 34 charged Nicolo with conspiring with Camarata and Schwab, the Greece tax assessor, to violate those statutes.

"The corpus of a money-laundering conspiracy is the funds that the defendant conspired to launder."  *United States v. Huber*, 404 F.3d 1047, 1056 (8th Cir. 2005).  Any funds that Nicolo conspired to launder, then, are subject to forfeiture, as are any funds that "facilitated" his money laundering offenses.

"Facilitation of a laundering offense occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance."  *Id.* at 1060 (quoting *United States v. Hawkey*, 148 F.3d 920, 928 (8th Cir. 1993)).  Although "'the mere pooling or commingling of tainted and untainted funds in an account does not, without more, render the entire contents of the account subject to forfeiture[,]' ... [f]orfeiture of commingled funds ... is proper when the government demonstrates that the defendant pooled the funds to facilitate or 'disguise' his illegal scheme."  *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003) (quoting *Bornfield*, 145 F.3d at 1135).  Indeed, in many cases "[i]t is precisely the commingling of tainted funds with legitimate money that facilitates the laundering and enables it to continue."  *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1353 (D.C. Cir. 2002) (quoting *Tencer*, 107 F.3d at 1135).

---

[11]Section 1956(h) provides that "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

In *United States v. Wyly*, 193 F.3d 289, 302 (5th Cir. 1999), for example, the defendant was a public official who accepted a kickback in return for steering the contract for the construction of a privately-owned prison to a particular contractor.  After the defendant was convicted of money laundering, the court held that the government was entitled to forfeiture of the new jail itself, as property involved in the money laundering offense.  The Fifth Circuit reasoned that the prison "was the source of the criminal proceeds and was indispensable to the money laundering conspiracy.  Without the prison, there could have been no bribery, mail fraud, or money laundering."  *Id.* at 302.

The Court of Appeals for the Eighth Circuit also explained in *Huber* that "[f]acilitation is not to be confused with promotion under section 1956(a)(1)(A)(I)."  Section 1956(a)(1)(A)(I) makes it a crime to conduct a financial transaction involving the proceeds of specified unlawful activity "with the intent to promote the carrying on of specified unlawful activity."  That provision, the *Huber* court stated, is aimed at the use of unlawfully obtained funds to promote "*the specified unlawful activities* [such as fraud] that generate the funds being laundered."  In contrast, "facilitation under section 982(a)(1)'s 'involved in' clause is geared at the forfeitability of instrumentalities, including funds in some cases, that facilitate ... *the money-laundering transactions*.  ... Facilitating funds can be forfeited even if they were not part of the money-laundering transaction."  404 F.3d at 1061.

"The Second Circuit appears to have embraced the 'facilitation' approach."  *Schlesinger*, 396 F.Supp.2d at 272 (citing *United States v. G.P.S. Automotive Corp.*, 66 F.3d 483, 486 (2d Cir. 1995)); *see also United States v. Approximately 250 Documents Containing the Forged Hand Writing of President Kennedy*, No. 03 CV 8004, 2008 U.S. Dist. LEXIS 67452, at *13 (S.D.N.Y.

Sept. 5, 2008) ("The term 'involved in' refers to property that is itself being laundered, as well as property used to facilitate a money laundering offense").  *But see United States v. Contents in Account No. 059-644190-69*, 253 F.Supp.2d 789, 798 (D.Vt. 2003) (stating that "[t]he validity of the government's 'facilitation' theory remains an open question in this Circuit").  It bears repeating, however, that application of that approach requires more than a mere showing that tainted and untainted funds were pooled together; rather, "[t]he innocent funds must have been used in some way to hid the nature of the tainted funds." *Id.* at 799.

In the case at bar, most of the assets as to which the government seeks forfeiture were, at the time of their seizure, in the possession of codefendant Roeder, Nicolo's wife.  Specifically, the government seeks forfeiture of six bank accounts, three automobiles, and two parcels of real property; two of those bank accounts and two of the vehicles were owned by Nicolo, and the other properties were all owned by Roeder.  The total sums in Roeder's bank accounts at the time of seizure–roughly $10 million–also far exceeded the amounts in Nicolo's accounts, which contained about $141,300.

In his affidavit, Ciavarri analyzed an account controlled by Nicolo, held by Advanced Valuation Services ("AVS"), at the National Bank of Geneva, Account No. 271303409 ("the '409 account").  The government demonstrated that from April 2000 to August 2004, over $4.6 million was deposited into the '409 account from Kodak.  (Dkt. #336-2, ¶ 6).  Ciavarri also listed transfers, totaling approximately $4.6 million dollars, that Nicolo sent from the '409 account and other accounts that he controlled, to his wife, Roeder, in Florida.  Many of these payments were contemporaneous with monies paid to Nicolo by Kodak.

Although the government does not appear to take any position at this point on whether any of the funds in Roeder's accounts came from legitimate sources, it appears to be undisputed that at least some of the money in those accounts had no direct connection to Nicolo's fraud crimes, and did not represent proceeds of those crimes.  Ciavarri's affidavit submitted in support of the government's forfeiture motion, which details a number of deposits into and debits from Roeder's accounts, indicates, for example, that at the time a certain check was deposited into Roeder's Fifth Third Bank CD account on July 30, 2004, that account "already contained approximately $2,372,186.72," Dkt. #336-2 ¶ 15.  There is no explanation or evidence of where that money came from, nor has the government attempted to show that such previously-deposited funds were themselves forfeitable, independent of any commingling with Nicolo's fraud proceeds.

The government's position appears to be that it is unnecessary to reach any of those issues at this point.  The government contends that as long as it has shown some nexus between the offenses of which Nicolo was convicted and the properties at issue, that is enough to support entry of a preliminary order of forfeiture as to Nicolo, leaving any issues as to Roeder's interest in the property for a later ancillary proceeding.  I agree.

Nicolo argues that the seized property is not subject to forfeiture because the government has failed to show that Roeder was anything other than an innocent owner of those properties.  Nicolo also contends that the government has shown, at most, "mere commingling" of tainted and untainted funds, which, according to Nicolo, is insufficient to support forfeiture absent additional proof of intent to conceal the source or nature of the tainted funds, or otherwise to facilitate the money-laundering offense.

Nicolo's arguments in this regard, however, are both "premature and not his to make,"
since "a defendant does not have standing to object to forfeiture on the grounds that a third party
owns the property." *United States v. Wittig*, No. 03-40142-01-02, 2006 WL 13158, at *3
(D..Kan. Jan. 3, 2006).  *See also United States v. Christunas*, 126 F.3d 765, 769 (6th Cir. 1997)
("It is well-established that the defendant has no standing to assert his wife's (third-party)
rights") (citing *United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1576 (9th Cir. 1989), *cert.*
*denied*, 497 U.S. 1003 (1990)); *United States v. Tremblay*, No. 05 CR 783, 2008 WL 4571548, at
*2 (S.D.N.Y. Oct. 10, 2008) ("Because Tremblay claims to have no ownership interest in the
specified bank accounts, he lacks standing to challenge the [forfeiture] Order").

Roeder also has no standing to object to forfeiture of Nicolo's interest in the property.
Her rights, if any, to the properties will be adjudicated in the ancillary proceedings.  *See DSI*
*Associates LLC v. United States*, 496 F.3d 175, 183 (2d Cir. 2007) ("It is well established that
third parties may not intervene during criminal forfeiture proceedings to assert their interests in
the property being forfeited") (citations omitted).

The only issue before the Court at this juncture are whether the government has
"sufficiently established the requisite nexus between the property and [Nicolo's] violations" to
justify forfeiture *as to Nicolo*.  *United States v. Armstrong*, No. CRIM 05-130, 2007 WL 809508,
at *5 (E.D.La. Mar. 14, 2007) (rejecting defendants' arguments that forfeiture was improper
because properties belonged to third parties, and stating that "[t]he proper forum to determine the
extent of the Defendants' third party interest in the property is the ancillary proceeding, so that all
third parties may participate and the Court may ensure that all property forfeited actually belongs
to the Defendants").  *See also United States v. Evanson*, No. 2:05CR00805, 2008 WL 3107332,

at *2 n. 1 (D.Utah Aug. 4, 2008) ("The Court does not determine ownership issues[ in the criminal forfeiture proceeding]; ownership is determined in the ancillary proceeding").

Based on the evidence before me, I find that the government has adequately demonstrated that the bank accounts at issue are forfeitable under § 982. One of the accounts, Fifth Third Bank Account No. 700439979 ("the '979 account"), was held in the name of American Valuation Services ("AVS"), a company owned and controlled by Nicolo that was directly involved in Nicolo's fraud crimes. The government has submitted evidence that at least one deposit, in the amount of $2 million, was made into this account from Kodak in January 2005, during the existence of the fraud conspiracy of which Nicolo was found guilty. Another account, First United Bank Account No. 2400216, which was opened by Nicolo and held in his name, was funded by a check drawn on the '979 account.

The proof also establishes that the accounts held in Roeder's name received substantial sums from Nicolo and his businesses. As mentioned, Nicolo transferred over $4.6 million from his accounts to Roeder from August 1998 to July 2005. Dkt. #336-2 ¶ 5.

With respect to one of Roeder's accounts, for example, Fifth Third Bank CD Account No. 0380640212247, the government has traced several hundred thousand dollars of funds in that account back to the National Bank of Geneva '409 account.

Another of Roeder's accounts, Northern Trust Bank of Florida Account No. 5040001516, received over $1.4 million in deposits from the '409 account between March 2000 and December 2003, as well as other large deposits traceable back to Nicolo, his businesses, and ultimately to Kodak.

A third account, First United Bank CD Account No. 4400115 ("'115 account"), was

opened by Roeder in January 2005, with an initial balance of about $1.5 million.  Within days

after the account was opened, $400,000 was deposited into that account from Nicolo's '979

account in Geneva.  The fourth account in Roeder's name, First United Bank Account No.

2400224, has been funded to a great extent by interest generated by the '115 account.

Again, Nicolo does not really dispute these matters.  He simply argues that the

government cannot show that every dollar that he transferred into these accounts was necessarily

tainted (because Nicolo allegedly had legitimate sources of income unconnected with his fraud

crimes), that Roeder's accounts were at least partly funded by sources other than Nicolo and his

businesses, and that the government has not demonstrated any deliberate commingling of "good"

and "bad" money for the purpose of disguising the unlawful nature of the funds received from

Nicolo.

These arguments fail, however, for several reasons.  First, to the extent that funds in

Roeder's accounts came from Nicolo, there is no evidence that he retained *any* cognizable

interest in those funds, irrespective of whether Nicolo had lawfully or unlawfully obtained the

funds in the first place.  If Nicolo gave those funds to Roeder, as a gift or otherwise, then he

presumably relinquished any claim to them, and as stated, he lacks standing to assert any claims

on Roeder's behalf.

Second, it is not necessary for the government to prove that the funds in question "could

not possibly have come from any source other than [Nicolo's] unlawful activity." *United States*

*v. Sokolow*, 91 F.3d 396, 409 (3d Cir. 1996) (quoting *United States v. Johnson*, 971 F.2d 562,

570 (10th Cir. 1992)) (discussing § 1957), *cert. denied*, 519 U.S. 1116 (1997).  The fact that

Nicolo's or Roeder's bank accounts may have contained some untainted funds cannot in itself

defeat the government's forfeiture claim; were it otherwise, it would be all too easy to avoid the

reach of the forfeiture statutes.[12]  *See United States v. $8,221,877.16 in U.S. Currency*, 330 F.3d

141, 158 (3d Cir. 2003) ("in the criminal forfeiture context[,] ... 'the term "traceable to" means

exactly what it says,'" and where tainted property has been commingled in a bank account with

untainted property, the government is only required "to prove '*some* nexus to the property

"involved in" the money laundering offense'") (quoting *Voigt*, 89 F.3d at, 1087 & n. 22); *United*

*States v. Baker*, 227 F.3d 955, 970 (7th Cir. 2000) ("Limiting the forfeiture of funds under these

circumstances to the proceeds of the initial [illegal] activity would effectively undermine the

purpose of the forfeiture statute.  Criminal activity such as money laundering largely depends

upon the use of [other] monies to advance or facilitate the scheme") (quoting *Tencer*, 107 F.3d at

1135), *cert. denied*, 531 U.S. 1151 (2001).

I recognize that there is also authority that "the mere pooling or commingling of tainted

and untainted funds in an account does not, without more, render the entire contents of the

account subject to forfeiture."  *Puche*, 350 F.3d at 1153 (quoting *Bornfield*, 145 F.3d at 1135).

As stated, however, whether *all* of the funds in Roeder's accounts are ultimately subject to

forfeiture, or whether Roeder, or any other third party, has an interest in those funds that is

superior to the government's, is an issue for another day, in another proceeding.  *See United*

*States v. Andrews*, 530 F.3d 1232 (10th Cir. 2008) (at the preliminary order of forfeiture stage,

---

[12]I also note that the '979 account, which was the source of much of the funds in Roeder's accounts, had a balance of less than $30,000 at the time that it was seized, making it virtually certain that some of the funds that were transferred out of that account to Roeder's accounts were "tainted."

"the court does not–and, indeed, may not–determine the rights of any third parties who assert an interest in the property").

As mentioned above, the statutes and rules governing criminal forfeiture provide for notice to interested third parties, and for an ancillary proceeding in which anyone other than the defendant who asserts an interest in the subject property may file a petition seeking amendment of the forfeiture order to exclude the petitioner's interest from the scope of the forfeiture. *Id.*; *see*, *e.g.*, *United States v. Wahlen*, 459 F.Supp.2d 800 (E.D.Wisc. 2006).  Until then, the interests of Roeder or anyone else other than Nicolo and the government are simply not before me.  *See Lazarenko*, 476 F.3d at 648 ("Upon a finding that the property involved is subject to forfeiture, a court must promptly enter a preliminary order of forfeiture without regard to a third party's interests in the property"); *United States v. Nava*, 404 F.3d 1119, 1125 (9th Cir. 2005) ("third parties must await the defendant's conviction before filing proceedings to protect their interest in the property and must await the court's order of forfeiture before requesting an ancillary hearing"); *see also DSI Associates LLC v. United States*, 496 F.3d 175, 183 (2d Cir. 2007) (It is ... well settled that section 853(n) provides the exclusive means by which a third party may lay claim to forfeited assets–*after* the preliminary forfeiture order has been entered") (emphasis added).

For much the same reasons, I conclude that the three vehicles at issue here are also subject to forfeiture.  With respect to one of the vehicles, a 2002 BMW, the government has submitted evidence that the purchase price after trade-in was $49,741.90, and that this amount was paid by a check drawn on AVS's '409 account at the National Bank of Geneva.  Similarly,

another vehicle, a 2004 Volvo, was paid for with a check for about $38,000, which was also drawn on the '409 account.

With respect to the third vehicle, a 2005 Bentley, the tracing of the funds used in its purchase is more complex, but the proof shows that a substantial portion, if not all, of its purchase price was paid by funds that can ultimately be traced back, through a series of transactions, to accounts held by Nicolo or his businesses, and, beyond that, to payments made to those businesses by Kodak, attributable to Nicolo's fraud scheme.

Based on this evidence, I conclude that, at least as to Nicolo, these vehicles are subject to forfeiture as property "traceable to" property involved in Nicolo's money laundering offenses. *See United States v. Pretty*, 98 F.3d 1213, 1219 (10th Cir. 1996), *cert. denied*, 520 U.S. 1266 (1997); *Voigt*, 89 F.3d at 1087; *United States v. One 1987 Mercedes Benz 300E*, 820 F.Supp. 248, 252 (E.D.Va. 1993).  If Roeder contends that she has some interest, as an "innocent owner" or otherwise, in those vehicles, she may assert that interest in an ancillary proceeding, pursuant to Rule 32.2(c).

With respect to the real property, however, I find that the government has not carried its burden of demonstrating a sufficient nexus between the properties and Nicolo's money laundering activities so as to justify forfeiture of the properties.  Whatever connection may have existed between those properties and Nicolo's money laundering, it was simply too incidental and insubstantial to support forfeiture.

In support of its motion, the government contends that the evidence shows that Nicolo used these two properties "to facilitate the receipt of illegal payments and thereafter [to] conduct financial transactions with the same funds ... ."  Government's Motion (Dkt. #336) at 40.  The

- 24 -

government also asserts that the properties helped Nicolo "maintain[] an overall appearance of a legitimate business to further the illegal money-laundering activity ... ." *Id.* The government contends that Nicolo generated invoices using the addresses of those properties as the mailing address of his businesses, that he faxed invoices from those properties, and that checks from Kodak were sent to those addresses in payment of those invoices. *Id.* at 40-41.

The evidence relied on by the government is certainly dissimilar from, and much more tenuous than, that which typically exists in cases in which courts have found real property to have been involved in money laundering. For example, in *United States v. Schlesinger*, 261 Fed.Appx. 355 (2d Cir. 2008), evidence at the defendant's criminal trial showed that the defendant had deposited the proceeds of his insurance and creditor fraud into the business operating accounts of the companies he ran at the subject premises, and that the proceeds were then used to pay the companies' monthly lease and tax expenses. The Second Circuit held, based on that evidence, that "the premises 'served as a conduit for the proceeds of the illegal transactions,' making it subject to forfeiture." *Id.* at 361 (quoting *United States v. All Assets of G.P.S. Auto. Corp.*, 66 F.3d 483, 486 (2d Cir. 1995)).

Consistent with that holding, the case law indicates that as a general rule, some direct financial link between a defendant's money laundering and his real property must be shown before a court will order forfeiture of the property. *See United States v. 10.10 Acres on Squires Rd.*, 386 F.Supp.2d 613, 617 (M.D.N.C. 2005) ("Real property is involved in a money laundering offense if laundered funds are used to make payments toward purchase of the property and to pay for improvements") (citing *United States v. Myers*, 21 F.3d 826, 831 (8th Cir. 1994)); *see, e.g., United States v. 2121 Kirby Drive, Unit 33*, No. CIV A. H-06-3335, 2007 WL 3378353, at *5

(S.D.Tex. Nov. 13, 2007) (forfeiture complaint "allege[d] a direct connection" between claimant's late husband's money laundering and real property, where government alleged that husband–the former CEO of Enron Corp.–had knowingly used illicit funds to pay down the outstanding mortgage on the property, and that he paid off the remainder of the mortgage by making million-dollar payments of criminal proceeds within five days after Enron declared bankruptcy); *United States v. Odom*, No. 5:03CR24, 2007 WL 2433957, at *8 (S.D.Miss. Aug. 22, 2007) (finding that purchase of nightclub "did facilitate the money laundering conspiracy inasmuch as the purchase of the real estate further dispersed and hid the laundered funds"); *United States v. One Parcel of Real Property Located at Route 2, Box 293*, 46 F.Supp.2d 572, 579 (S.D.Miss. 1998) (finding probable cause to believe that a substantial connection existed between real property and money laundering, based on evidence indicating that claimants, one of whom who had been convicted of drug dealing offenses, had no legitimate source of income that would have enabled them to build home costing nearly $400,000).

   In the case at bar, no such connection has been demonstrated, or even alleged.  Instead, the government relies on some of Nicolo's acts, such as faxing invoices, that he performed at these two properties, and his use of those properties as a mailing address for his businesses.

   I find these activities to be merely "incidental or fortuitous" in relation to Nicolo's offenses.  Even assuming *arguendo* that a financial link (such as payment of a mortgage with illicit funds) is not a *sine qua non* for forfeiture, such activities, on the facts before me, simply do not establish enough of a connection between Nicolo's money laundering and the property to warrant forfeiture of the property.  *See United States v. Parcel of Property*, 337 F.3d 225, 233 (2d Cir. 2003) ("There must be more than an incidental or fortuitous connection between the property

and the illegal activity" to justify forfeiture); *accord United States v. Sabhnani*, 566 F.Supp.2d
148, 153 (E.D.N.Y. 2008).

Furthermore, even if these acts could be viewed as more than merely incidental in relation
to Nicolo's crimes, these activities related more to Nicolo's *fraud* offenses than to his money
laundering, and it is the money laundering, not the fraud, that forms the basis for the
government's forfeiture motion as to these properties.  *Compare* Government's Motion at 29, 40-
41 (listing properties among specific assets sought pursuant to "First Forfeiture Allegation" as
"property involved in money laundering"), *with* Government's Motion at 41-43 (seeking
$9,699,264 as "proceeds of mail and wire fraud").[13]

In an analogous case, *United States v. Iacaboni*, 221 F.Supp.2d 104 (D.Mass. 2002), *aff'd
in part, rev'd on other grounds in part*, 363 F.3d 1 (1st Cir.), *cert. denied*, 543 U.S. 978 (2004),
the criminal defendant had pleaded guilty to managing an illegal gambling business, gambling
conspiracy, substantive money laundering, and money laundering conspiracy.  In the plea
agreement, the defendant and the government agreed to a bench trial on whether the defendant's
house and various funds were subject to forfeiture as "involved in" the money laundering
conspiracy under § 982(a)(1).

Following the bench trial, the district court ordered forfeiture of the funds, but not of the
house.  In so ruling, the court stated that it was "important to note from the outset" that the sole

---

[13]At oral argument on the government's forfeiture motion, counsel for the government
also stated that the government "want[s] a judgment" for $9.6 million "under the second
[forfeiture] allegation, which is the fraud," and that "with respect to the money laundering in the
first forfeiture count, what we are really asking for is the assets that are identified that were used
in money laundering transactions."  Transcript (Dkt. #410) at 34 lines 1-9.

basis for the government's forfeiture motion was the money laundering offenses, and that the

government had not sought forfeiture pursuant to the gambling statute's forfeiture provision, 18

U.S.C. § 1955(d).  *Id.* at 110.  Therefore, the court stated, "property that was used in defendant's

illegal *gambling* business, but was *not* also 'involved in' defendant's money laundering offense

in violation of Section 1956, will not be subject to forfeiture."  *Id.* at 111.

The court went on to state that "substantial evidence exists that the Union St. property

was used to promote defendant's gambling business," including evidence that "[e]nvelopes with

money and documents were dropped off and picked up in the garage, faxes and phone calls

related to the enterprise came to and went from the residence, football tickets were 'corrected' on

the premises, and meetings were held in the house."  *Id.* at ''115.  But, the court added, "'use' of

a piece of property to promote a gambling activity ... does not make the user guilty of money

laundering under § 1956."  *Id.*  That distinction between the two types of offenses was critical in

*Iacaboni*, the court explained, because "[t]o justify forfeiture under § 982, it [wa]s not enough

merely to show that the Union St. property was involved in the gambling operation; the

Government [had to] demonstrate that the house was involved in money laundering."  *Id.* at 116

(footnote omitted).

The court further held that

[t]he evidence demonstrating such involvement in this case falls far short.  The heart of
an act of money laundering is a transaction involving illegal proceeds.  Most of what the
Government cites as support for its forfeiture claim against the house–the faxes and
phone calls, the "correcting" of football tickets and the like–was not by any construction a
"transaction" at all.  This sort of criminal activity constituted merely conduct supporting
the gambling operation and does not reflect involvement of the real property in money
laundering.

*Id.* The court did note evidence that the property was used as a pickup and drop-off point for cash payments in connection with the defendant's gambling business, but, the court concluded, that "use, on the facts of this case, was no more than 'incidental or fortuitous.'" *Id.* (quoting *United States v. 916 Douglas Ave.*, 903 F.2d 490, 494 (7th Cir. 1990), *cert. denied*, 498 U.S. 1126 (1991)). "While the forfeiture statute covering money laundering is broad," the court reasoned, "it cannot be stretched to require forfeiture of any site where felons pass cash back and forth, without losing its boundaries almost entirely." *Id.*

The same reasoning applies here. To the extent that the evidence establishes some connection between these two properties and Nicolo's crimes, that connection mostly involves the fraud offenses, not the money laundering. Even the government's motion (which, as stated, seeks forfeiture of these properties based only on their alleged nexus with Nicolo's money laundering) spends much of the three paragraphs that it devotes to these properties on activities connected with the fraud scheme, such as Nicolo's receipt of payments from the fraud victims at those addresses, and his sending of invoices from those addresses to Kodak and other victims of the fraud. Similarly, the government states that "these properties were routinely utilized to facilitate the execution of the *fraudulent* schemes," and that "[i]n order for the scheme [to defraud] to succeed, it was necessary for the business entities of Nicolo ... to maintain physical locations that represents [sic] a place or places of business." Government's Motion at 40 (emphasis added). None of that establishes any *direct* connection between the properties and the money laundering offenses.

The government does assert that "these properties were clearly utilized to facilitate the money laundering transactions for which the defendant has been convicted." *Id.* That is a

conclusion, however, not a fact, and the evidence does not support that conclusion.  The

government may be correct in asserting that Nicolo, at some point, "conduct[ed] financial

transactions with the [unlawful] funds" that the victims mailed to him at those addresses, but

even if he physically wrote checks to Roeder at those properties (and there is no evidence that he

did), that does not show that the properties themselves had any more than a fortuitous, transitory,

and tangential relationship to the money laundering.  That is not enough to justify forfeiting the

properties to the government under § 982(a)(1).  *See United States v. Loe*, 49 F.Supp.2d 514,

519-20 (E.D.Tex. 1999) (setting aside jury's verdict of forfeiture of defendants' lease rights to

real property, where government had suggested only a "tenuous nexus, if any, between the lease

rights and the [defendants'] money laundering offenses," and where "the Government failed to

offer evidence that the lease rights had a connection to the money laundering offenses

themselves, as distinct from the underlying mail or wire fraud conspiracy").


## III. Forfeiture as to Defendant Finnman

The other defendant as to whom the government seeks a preliminary order of forfeiture is

David Finnman.  Finnman worked at Kodak's Corporate Tax Department during the time of the

scheme, up until June 1999, when he went to work at Frontier Telephone of Rochester, which

was later purchased by Global Crossing Telecommunications, Inc. ("Global").  At both Kodak

and Global, Finnman caused Nicolo and Nicolo's companies to be hired to perform property

assessment services for Kodak and Global, in return for which Finnman received kickbacks from

Nicolo and Schwab.

With respect to Finnman, the government seeks a money judgment in the amount of $385,393, which it contends represents "the gross proceeds received by, or reasonably foreseeable to" Finnman in connection with the crimes of which he was convicted. That amount appears to be based on the government's calculation of the loss amount with respect to the victims, Kodak and Global. The loss amount, in turn, is based on the kickback amounts paid by Nicolo to Schwab, Finnman, and Advanced Business Valuation Services ("ABVS"). ABVS was a company that Schwab and Finnman started together in the Bahamas, apparently as a place to deposit or invest money that they received through the kickback scheme.

The evidence presented by the government on its forfeiture motion with respect to Finnman is sparse, particularly in comparison with Nicolo; about one page of the government's 45-page brief is devoted to the amounts that the government seeks as to Finnman. *See* Dkt. #336 at 42. Even taking into account Nicolo's and Finnman's relative roles in the underlying offenses, the government's discussion of the amounts subject to forfeiture as to Finnman is far from extensive.

After reviewing the record, I conclude that the government is entitled to an order of forfeiture as to Finnman, but not in the amount sought by the government. I find that the total amount that should be forfeited as to Finnman is $144,196, based on the total amount of the proceeds attributable to him.

The evidence establishes that in connection with a 1998 contract with Kodak relating to certain Kodak property in Greece, Nicolo made a payment to Schwab in the amount of $30,000, and that, in accordance with their usual practice, Schwab gave Finnman half of that amount, $15,000.

- 31 -

Similarly, after Finnman left Kodak to work at Global, he caused Nicolo to be awarded a $65,000 contract to assess certain property owned by Global. Nicolo subsequently paid Schwab half of that amount, or $32,500, half of which, $16,250, Schwab paid to Finnman. In addition, with respect to that contract, Nicolo gave Finnman's daughter a check $2500, purportedly for work that she had performed for Nicolo. Finnman's daughter later endorsed that check over to Finnman. Both of those payments to Finnman relating to Global, totaling $33,750, are forfeitable as proceeds of the fraud scheme under § 981(a)(1)(C). *Zvi*, 168 F.3d at 52.

In addition, the proof showed that Nicolo paid ABVS a total of $220,893. Nicolo paid ABVS $185,893 in connection with a 1997 contract with Kodak, and an additional $35,000 in connection with the 1998 Kodak contract. I conclude that half of that amount, $110,446.50, is subject to forfeiture as to defendant Finnman. Added to the $33,750 that Finnman received from Nicolo through Schwab and Finnman's daughter, that brings the total amount subject to forfeiture as to Finnman to $144,196.50.

That is significantly less than the amount sought by the government, but, as indicated, the government has provided little detail supporting its forfeiture request as to Finnman. In addition, to the extent that the government bases its request on the victims' *loss* amount, I am not convinced that such an amount is the proper measure of forfeiture here. The government recognizes in its brief that "restitution and forfeiture are mutually exclusive and different concepts," Dkt. #336 at 41, but then adds, without explanation or citation of authority, that in this case the restitution and forfeiture amounts are the same. *Id.* at 41-42.

As stated, however, restitution is typically "calculated based on the victim's loss, while forfeiture is based on the offender's gain." *Webber*, 536 F.3d at 603. Although there may

certainly be cases in which the two amounts are the same, *see, e.g.*, *United States v. Segal*, 495 F.3d 826, 839 (7th Cir. 2007), *cert. denied*, 128 S.Ct. 2069 (2008), this is not such a case.  A significant portion of the amount sought by the government went from the victims to Nicolo to Schwab, and there has been no showing that Finnman ever received those monies or had any control over them.  I conclude, therefore, that Finnman is subject to forfeiture not simply in the amount of the victims' loss, but of the amounts paid to him directly, as well as half the amounts paid to ABVS, pursuant to the fraud scheme.  Whether Finnman is subject to an order of restitution for other, additional amounts based on the victims' loss is an issue not now before me.


## CONCLUSION


The government's motion for a preliminary order of forfeiture (Dkt. #336) is granted in part and denied in part.

Defendant John Nicolo shall forfeit to the United States all of his interest in the following property, pursuant to Rule 32.2(b) of the Federal Rules of Criminal Procedure:

The monies and contents of Fifth Third Bank Account No. 700439979;

The monies and contents of Fifth Third Bank CD Account No. 0380640212247;

The monies and contents of Northern Trust Bank Account No. 5040001516;

The monies and contents of First United Bank Account No. 2400224;

The monies and contents of First United Bank Account 2400216;

The monies and contents of First United Bank CD Account NO. 4400115;

One 2002 BMW 745 LI bearing VIN WBAGN63442DR01267;

One 2004 Volvo C70 convertible bearing VIN YV1NC63D24J061116; and

One 2005 Bentley GT Continental bearing VIN SCBCR63W55C025183.

In addition, a money judgment in the amount of $9,729,264 shall issue in favor of the United States against defendant Nicolo.

A money judgment in the amount $144,196.50 shall issue in favor of the United States against defendant David Finnman.

Upon entry of this Order, the United States is authorized to commence any applicable proceeding to comply with statutes governing third-party rights, including giving notice of this Order.  The United States shall publish notice of the order and its intent to dispose of the property in such a manner as the United States may direct.  The United States may also, to the extent practicable, provide written notice to any person known to have an alleged interest in the subject property.

Any person, other than the above named defendant, asserting a legal interest in the subject property may, within thirty (30) days of the final publication of notice or receipt of notice, whichever is earlier, petition the court for a hearing without a jury to adjudicate the validity of his alleged interest in the subject property, and for an amendment of the order of forfeiture.

Pursuant to 32.2(b)(3) of the Federal Rules of Criminal Procedure, this Preliminary Order of Forfeiture shall become final as to each defendants at the time of his sentencing, and shall be made part of the sentence and included in the judgment.  If no third party files a timely claim, this Order shall become the Final Order of Forfeiture, as provided by Rule 32.2(c)(2).

Any petition filed by a third party asserting an interest in the subject property shall be signed by the petitioner under penalty of perjury and shall set forth the nature and extent of the

petitioner's right, title, or interest in the subject property, the time and circumstances of the petitioner's acquisition of the right, title or interest in the subject property, any additional facts supporting the petitioner's claim, and the relief sought.

The United States shall have clear title to the subject property following the Court's disposition of all third-party interests, or, if none, following the expiration of the period provided by statute for the filing of third-party petitions.

The Court shall retain jurisdiction to enforce this Order, and to amend it as necessary, pursuant to Fed. R. Crim. P. 32.2(e).

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
        February 17, 2009.