UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,


                          Plaintiff,

                                                    DECISION AND ORDER

                                                    05-CR-6161L


              v.


JOHN NICOLO,
DAVID FINNMAN,


                          Defendants.

_____


        Defendants John Nicolo and David Finnman have been convicted after jury trial of multiple

counts involving conspiracy, mail and wire fraud, and money laundering.  Defendant Nicolo was

remanded into custody immediately after the jury returned its verdict on May 20, 2008.  On February

19, 2009, Nicolo was sentenced by this Court to a term of imprisonment of 144 months.

        Defendant Finnman was also sentenced on February 19, 2009, to a 21-month term of

imprisonment.  Finnman, who had previously been released on bail, was allowed to self-surrender,

which he did on May 14, 2009.

        Both Nicolo and Finnman have moved for release from custody pending the outcome of their

appeals, which are currently pending before the Court of Appeals for the Second Circuit, pursuant

to 18 U.S.C. § 3143(b).  For the reasons that follow, both motions are denied.

**DISCUSSION**

## I. General Principles

Section 3143(b) provides in general that when a defendant has been convicted, and has filed an appeal or a petition for a writ of certiorari, the district court *shall* order that he be detained, unless the court finds, by clear and convincing evidence, that: (1) the defendant is not likely to flee; (2) if released, the defendant is not likely to pose a danger to the safety of any other person or the community; *and* (3) the appeal is not for the purpose of delay, and raises a substantial question of law or fact likely to result in reversal, an order for a new trial, a sentence that does not include a term of imprisonment, or a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process. "The defendant bears the burden of persuasion as to all of the elements in subsection (b)." *United States v. Lima,* No. 06-cr-00349, 2007 WL 4565030, at *1 (E.D.N.Y. Dec. 21, 2007)(citing *United States v. Randell,* 761 F.2d 122, 125 (2d Cir. 1985)).

A question raised on appeal is "substantial" if it "is one of more substance than would be necessary to a finding that it was not frivolous. It is a 'close' question or one that very well could be decided the other way." *Randell*, 761 F.2d at 125 (quoting *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)). If the district court does find that a question raised on appeal is "substantial," the court "must then consider whether that question is 'so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.'" *Randell*, 761 F.2d at 125 (quoting *United States*

*v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985)). "[O]n this issue, as on all the criteria set out in subsection (b), the burden of persuasion rests on the defendant." *Id.*

The statute, then, creates a "presumption that a defendant who has received a sentence of imprisonment will be detained pending appeal ... ." *United States v. Ciccone*, No. 07 Cr. 399, 2008 WL 2498242, at *1 (S.D.N.Y. June 19, 2008). "The convicted defendant bears a heavy burden in arguing for release pending appeal" under this provision. *United States v. Weisberg*, No. 07-CR-66, 2008 WL 5114218, at *1 (W.D.N.Y. Nov. 25, 2008) (citation omitted); *accord United States v. Ramjohn*, No. 96 CR 767, 2008 WL 974580, at *1 (E.D.N.Y. Apr. 8, 2008). *See also United States v. Abuhamra*, 389 F.3d 309, 317 n.5 (2d Cir. 2004) (noting "the heavier burden imposed by 18 U.S.C. § 3143(b)" compared to release pending sentencing under § 3143(a)); *United States v. Blair*, No. 06-CR-208, 2009 WL 3672064, at *1 (W.D.N.Y. Oct. 29, 2009) ("The defendant bears the burden of proving that he does not pose a risk of flight or a danger to the community").

## II. Nicolo's Motion

In his motion, Nicolo raises a panoply of reasons why, he claims, he should be released pending appeal. He alleges that he does not pose a danger to the community, and is not a flight risk, because: (1) he is in his late seventies and in ill health; (2) he would have no access to firearms if released; and (3) he has a "long history of compliance" with this Court's orders and conditions of release.

Nicolo also contends that he has raised substantial issues on his appeal. Specifically, he has asserted on appeal that this Court erred in denying his motion to change venue, and in denying his

request for a three-month continuance for medical reasons. He also alleges that the prosecutor committed misconduct in his closing argument at Nicolo's trial, and that Nicolo's own trial attorney (who no longer represents Nicolo) was ineffective.[1]

Having reviewed Nicolo's motion and the Government's response, and based on my familiarity with this case, I conclude that Nicolo has fallen far short of the showing required under § 3143. His motion, then, is denied.

First, while it does appear that Nicolo suffers from some health problems, that alone does not mean that he poses no flight risk or danger to others. *See*, *e.g.*, *United States v. Rogers*, No. SA:06-CR-00272, 2006 WL 1677849, at *1-*2 (W.D.Tex. June 12, 2006) (rejecting defendant's argument that because of his age–63–recent heart attack, and absence of past violent behavior, he did not pose a flight risk or danger to others, in light of other evidence concerning defendant's past behavior); *United States v. Sessa*, 821 F.Supp. 870, 873 (E.D.N.Y. 1993) ("No matter how aged or infirm, [defendants] will continue to represent serious dangers to the community").

That is not to say that Nicolo's age and health are not relevant considerations, but only that they are not the only factors that the Court should consider relative to the risk that he would attempt to flee or pose a danger to the community if released. *See*, *e.g.*, *United States v. Sudeen*, No. CR. 02-062, 2003 WL 21977170, at *1-*2 (E.D.La. Aug. 14, 2003) (denying defendant's motion to be released pending sentence, notwithstanding defendant's series of health problems, and noting that "there is no evidence that the defendant cannot obtain necessary medical treatment while in custody").

---

[1]Nicolo's current attorney was substituted for his trial counsel on the same day that he filed Nicolo's motion for release pending appeal, February 23, 2010.

Indeed, while a defendant's advanced age may, in some circumstances, tend to diminish those risks, it may also increase the risk of flight, especially where the defendant is facing a lengthy prison sentence; such a defendant may feel that he has little or nothing to lose by fleeing. The Second Circuit recently noted this concerning a request for release by Bernard Madoff. *United States v. Madoff*, 316 Fed.Appx. 58, 59 (2d Cir. 2009) ("As to the incentive to flee (based on his age and exposure to a lengthy imprisonment), we consider that such an incentive naturally bears upon and increases the risk of flight"); *see also United States v. Georgiou*, Cr. No. 09-88, 2010 WL 701892, at *2 (E.D.Pa. Mar. 1, 2010) (finding that defendant had failed to show that he was unlikely to flee, in part because defendant was "effectively facing a possible life sentence"); *United States v. Bedoya*, No. 89 CR 803, 1990 WL 164826, at *1 (S.D.N.Y. Oct. 22, 1990) (finding, based on defendant's "demeanor at trial and the fact that he [wa]s faced with spending a significant portion of the rest of his life in custody," both that he "ha[d] an incentive to flee" and that "he ha[d] no respect for his legal obligation" not to flee).

In addition, notwithstanding Nicolo's claim to have established a "long history of compliance" with this Court's orders and conditions imposed on his prior release, the record in this case shows exactly the opposite. Indeed, as this Court has commented on prior occasions, Nicolo has consistently seen himself, throughout this prosecution, as a victim, and he has elevated his own perceived interests above the law, the Court's orders, and the interests of others in general.

This Court has already addressed matters relating to Nicolo's violations of the conditions of his release. On December 15, 2008, the Court issued a Decision and Order granting the Government's motion to revoke Nicolo's release pending sentence. In that decision, I noted that

"[w]ithin a matter of hours" after releasing Nicolo on bail on September 8, 2008, "the Court received information that Nicolo had almost immediately violated the conditions of the Court's order not to contact [his wife and codefendant] Constance Roeder, her family or Roeder's attorneys." 2008 WL 5234342, at *1. Based on that information, the details of which need not be repeated here, the Court issued a warrant for Nicolo's arrest, and on September 11, 2008, members of the United States Marshal's Service forcibly entered Nicolo's residence, where they found him hiding in the basement. *Id.*

That was not all. In support of its motion to revoke bail, the Government also brought to the Court's attention information that Nicolo–who had previously been ordered to surrender all firearms to the United States Marshal–had contacted a friend and requested that he retrieve a firearm from Nicolo's home in Florida. Acting on that information, the Marshal's Service entered the property and retrieved the firearm. In my Decision and Order, I found that Nicolo's "failure to surrender this firearm violates prior orders of this Court entered during the trial itself requiring Nicolo to surrender firearms." That order, I noted, "was entered ... because of threats Nicolo allegedly made to one of the prosecutors in the case." *Id.*

Based on those findings, the Court found that Nicolo had violated the conditions of his release, and that there was no condition or combination of conditions that would assure that Nicolo would not pose a danger to any other person. In so ruling, the Court observed:

> Regardless of defense counsel's opinion that Nicolo will now be compliant with the Court's orders, Nicolo has failed to comply with such orders in the past, and I think it is unlikely that he would abide by any condition or combination of conditions. History has shown that in many respects Nicolo does what he wants to do regardless of the opinion of others or of Court orders.

*Id.* at *2.

At the time of Nicolo's sentencing, the Court also made a number of observations concerning why, in the Court's view, Nicolo could not be trusted to abide by any conditions that might be set on his release, and not to engage in any further wrongdoing while on release. I noted, for instance, that Nicolo's crimes "did not involve a momentary lapse of judgment or a single event, but repeated acts over a period of seven years at least." Dkt. #544 at 37-38. The Court also observed that the facts of this case demonstrated Nicolo's "deceit and [his] willingness to take virtually any action to accomplish what [he] thought was in the best interest of John Nicolo. Truth, honor, integrity apparently have no place in [his] heart." *Id.* at 40. *See United States v. Davis*, 664 F.Supp.2d 86, 90-91 (D.D.C. Oct. 16, 2009) (agreeing with government's assertion that "defendant consistently lied" in the course of committing fraud offense); *United States v. Nouri*, No. 07 Cr. 1029, 2009 WL 2924334, at *2 (S.D.N.Y. Sept. 8, 2009) (noting that defendant "has engaged in dishonest and obstructive conduct, ... committed fraud[,] ... was less than forthright with his own colleagues[, and w]hen he spoke directly to the Court following the verdict, he was not ... being truthful," and concluding, "I simply do not trust him to return to court were he released").

As I also noted at sentencing, Nicolo's lack of compunction about advancing his own perceived self-interest at the expense of others was demonstrated not only by the evidence at trial, but by Nicolo's actions and behavior during the course of the trial. In particular, during the trial, Nicolo telephoned a prospective Government witness, Earl Hollis, less than a day before Hollis was scheduled to fly from Florida to Rochester to testify. Nicolo left two messages on Hollis's answering machine suggesting that Hollis might want to obtain legal representation, and that if Hollis did not

already have a lawyer, Nicolo could help him find one.  Nicolo also stated that there had been another person on the Government's witness list who had retained an attorney, and that after she did so the Government decided not to call her as a witness.[2]  At Nicolo's sentencing, I stated, referring to Nicolo's actions, that they "involved a not very subtle attempt to dissuade this witness from coming and testifying."  Dkt. #544 at 41.

At sentencing, I also noted the extensive trial testimony by people who had been Nicolo's friends and associates, concerning the ways in which Nicolo had falsified records of his dealings with them, as part of Nicolo's efforts to launder the money that he had obtained as proceeds of his fraud scheme.  As the Court observed at sentencing, Nicolo "would abuse friends and business relationships if there was even [the] slightest possibility that [he] would benefit from it."  *Id.*

Nothing of any consequence has changed since the Court made those statements at the time of Nicolo's sentencing.  In fact, subsequent events have only served to confirm Nicolo's lack of integrity and trustworthiness, as evidenced by his blatant violations of the Court's presentence release order, as detailed above.  *See Davis*, 664 F.Supp.2d at 90 (agreeing with Government's assertion "that the defendant has not demonstrated that he currently is anymore less a flight risk than he was a time of the verdict, and that his failure to take responsibility for his actions, which is apparent from his denial of the theft and fraud charges, is persuasive in categorizing him as a flight risk"); *United States v. Kimoto*, No. 07-CR-30089, 2008 WL 4516315, at *3 (S.D.Ill. Oct. 6, 2008)

---

[2]Hollis's granddaughter retrieved Nicolo's messages, and called her grandfather on the day that he was scheduled to fly to Rochester.  After his granddaughter relayed Nicolo's messages to him, Hollis returned to his Florida home, and did not go to Rochester as scheduled.  *See* Dkt. #515 at 43-49.  Hollis did travel to Rochester a few days later, and testified on April 22, 2008.

(stating, as to the issues of risk of flight and danger to the community, that "nothing has changed in this case since Magistrate Judge Proud entered his order detaining Kimoto except that Kimoto has been sentenced to a lengthy period of incarceration," and adding that defendant's earlier violation of the conditions of his pretrial release was "not reassuring when considering the question of [whether to grant the defendant's motion for release on] bond" pending sentence).

I also find that Nicolo has failed to carry his burden of showing that he is not likely to pose a danger to the safety of any other person or the community if released. Although in light of his age and poor health Nicolo may not pose much of a physical danger to others, the danger of economic harm may also be considered by the court on a motion for release under § 3143. *See*, *e.g.*, *United States v. Norman*, No. 08-tp-80004-Cr., 2009 WL 464078, at *3 (S.D.Fla. Feb. 24, 2009) (commenting on "the Defendant's fundamental lack of respect for the rule of law," and finding that he "pose[d] a threat of economic danger to the community"); *Kimoto*, 2008 WL 4516315, at *4 (finding that defendant was an economic danger to the community, in light of his demonstrated "propensity to endanger the economic interests of others within the community"); *United States v. Napier*, No. CR. 97-214, 1998 WL 437273, at *2 (E.D.Pa. Aug. 3, 1998) (noting that defendant "has a history of fraud and dishonesty[,] ... that he continues to lie with impunity," and that he "previously ignored rules and conditions ... while he was on supervised release," and concluding, "I am not convinced that there are any conditions that will adequately protect the community" from further fraud were defendant released on bail).

At Nicolo's sentencing, the Court stated that I "have little concern that Mr. Nicolo will engage in similar activity at this point in his life, principally because I don't think that anyone would

hire him ... ."  Dkt. #544 at 45.  Considering his history and pattern of activity detailed above, however, I certainly do not believe that his scruples would stand in the way of his engaging in such activity, if he saw an opportunity to do so and thought that it might benefit him in some way.

Nicolo's refusal to accept any responsibility for his actions, and his utter lack of remorse for his crimes, or for the harm and suffering that he has inflicted upon others, reinforces this conclusion. The Court also commented upon this at sentencing, stating to Nicolo, "You expressed no remorse. You apparently have no shame for what happened.  You seek to blame others.  ... You have blamed everybody but yourself," and, "You take whatever you want from whomever you please, regardless of right or wrong, and regardless of the consequences to others."  Dkt. #544 at 47.  Thus, while danger to the community may not figure into the equation here to quite the same extent as the risk of flight, it nevertheless also weighs against a finding that Nicolo has met his burden under § 3143(b).  *See*, *e.g.*, *Bedoya*, 1990 WL 164826, at *2 (stating that "[i]t is also significant that Bedoya has not shown any remorse or accepted responsibility for his criminal conduct," and finding that defendant "cannot be trusted to adhere himself to lawful conduct if released on bail pending appeal").

Nicolo's assertion that he has raised substantial issues on appeal merits scant discussion.  His arguments concerning the prosecutor's closing argument were addressed and rejected by this Court in my August 6, 2008 Decision and Order denying Nicolo's post-trial motion for a judgment of acquittal or for a new trial.  *See* 2008 WL 3122278, at *2.  The Court stated then that "I believe[d] that the prosecutor's comments were not improper and, furthermore, in light of the amount of

evidence, the strength of it, and the length of this trial, the comment at issue was hardly prejudicial."
*Id.*

Likewise, I noted that Nicolo's post-trial motion repeated many arguments and issues that he had raised during the trial, including those raised in his prior motion for a change of venue based on pretrial publicity, and for a continuance because of his alleged health concerns. I stated with respect to the venue motion that "[n]othing advanced now by defendant Nicolo suggests any basis for the Court to reconsider the prior denial of this motion," and that Nicolo's "suggest[ion] that his health somehow disadvantaged him at the trial [was] without any basis in the record." *Id.* at *1.

I realize that the "substantial question" standard does not require the district court to find "that its own judgment is likely to be reversed on appeal." *Randell*, 761 F.2d at 124. Nevertheless, it is not enough for the defendant simply to show that he has raised a non-frivolous issue on appeal. The question presented must be "close," "fairly debatable," or "one that very well could be decided the other way." *Id.* at 125 (internal quotes omitted). I do not believe that Nicolo has met that standard.

I reach the same conclusion with respect to Nicolo's argument that his trial counsel was ineffective. That contention is so divorced from the facts as to be almost laughable. Nicolo received thorough, vigorous and effective representation not only throughout the trial, but throughout this entire case.

With respect to the particular error alleged here–trial counsel's failure to argue during the trial that Nicolo's ill health prevented him from participating effectively in his own defense–the Court did note, in my August 2008 decision, that "defendant Nicolo made no requests for any

accommodations during the trial itself," and that "[n]either Nicolo nor his several lawyers raised these concerns during the trial." 2008 WL 3211278, at *1. That, however, is a reflection not of negligence on the part of Nicolo's trial attorneys, but of the lack of merit to the suggestion that Nicolo's health problems somehow prejudiced him at trial. Having observed Nicolo throughout the trial, I find this to be little more than an after-the-fact fiction, and the failure of Nicolo's then-counsel to raise it during the trial itself does not even come close to meeting the standard for ineffective assistance. *See Puglisi v. United States*, 586 F.3d 209, 215 (2d Cir. 2009).[3]

It bears repeating that the burden on this motion is on Nicolo, who must show by clear and convincing evidence that he does not pose a risk of flight or a danger to the community, and by a preponderance that the appeal is not for purpose of delay, that it raises a substantial question of law or fact, and that if the substantial question is determined in his favor on appeal, the decision of the Court of Appeals would likely result in reversal or an order for a new trial. *United States v. Meyers*, 95 F.3d 1475, 1489 (10th Cir. 1996), *cert. denied*, 522 U.S. 1006 (1997); *United States v. Shelton*, No. 02CR00264, 2005 WL 1983761, at *1 (D.Conn. Aug. 16, 2005) (citing *Randell*, 761 F.2d 122); *United States v. Delanoy*, 867 F.Supp. 114, 115-16 (N.D.N.Y. 1994).[4]

A defendant's failure to establish any one of those elements is adequate ground for denying a motion under § 3143(b). *See*, *e.g.*, *United States v. Montgomery*, No. 08-CR-123, 2009 WL 1854010, at *2 (S.D.Ohio June 29, 2009) (rejecting defendant's argument that he should be released

---

[3]As stated, Nicolo's then-attorney did raise Nicolo's health issues in his pretrial motion for a continuance, which the Court denied on the merits.

[4]Even if a preponderance standard applied to all of the § 3143(b) elements, that would not alter the Court's decision here in any way.

pursuant to § 3143(b) based on his history of attendance at all scheduled hearings, his age (63) and poor health, and his compliance with the terms of his supervised release, where defendant had not raised a substantial question of law or fact likely to result in an alteration of his conviction or sentence on appeal).  Since Nicolo has not carried his burden on *any* of these elements, his motion for release pending appeal must be denied.

**III. Finnman's Motion**

With respect to defendant Finnman's motion, the Court agrees with Finnman that he does not appear to present a risk of flight or danger to the community if released.  Finnman was free on bail throughout this case, until his voluntary surrender in May 2009.  I also accept, at least for purposes of the present motion, that Finnman's appeal has not been taken for purposes of delay.

Where Finnman's motion for release falters, however, is on the "substantial question" prong. The "question" that Finnman claims is "substantial" here is whether the Supreme Court will strike down the honest services fraud statute, 18 U.S.C. § 1346, which underlies several of the counts of the indictment under which Finnman was convicted.

In 2009, the Supreme Court granted certiorari in three cases arising under that statute.  *See Skilling v. United States*, ___ U.S. ___, 130 S.Ct. 393 (2009); *Weyhrauch v. United States*, ___ U.S. ___, 129 S.Ct. 2863 (2009); *Black v. United States*, ___ U.S. ___, 129 S.Ct. 2379 (2009).  Finnman contends that "it is reasonable to conclude" that the Supreme Court will find § 1346 to be unconstitutional.  Dkt. #563-2 ¶ 45.  Finnman based that assertion in part on the transcripts of the

oral arguments in *Black* and *Weyhrauch*, which he contends make it "apparent ... that the Supreme Court is viewing the honest services fraud statute with a jaundiced eye." *Id.* ¶ 38.[5]

Based on Finnman's counsel's view as to what he guesses the Supreme Court will do, he seeks Finnman's release pending appeal. Finnman's arguments in support of that request are not persuasive. Although the three cases referenced above themselves arguably present "substantial questions" for the Supreme Court to resolve, Finnman's own appeal to the Second Circuit does not. Moreover, regardless of how the Supreme Court rules in those other cases, I do not believe that the questions presented in those cases are "so integral to the merits" of *Finnman's* conviction that any ruling by the Supreme Court in those cases necessarily "is likely to require reversal of [*Finnman's*] conviction or a new trial" in his case. *Randell*, 761 F.2d at 125.

As a starting point, it is useful to consider the questions on which the Supreme Court actually granted certiorari in those three cases. In *Weyhrauch*, the only question that the Court agreed to consider is "[w]hether, to convict a state official for depriving the public of its right to the defendant's honest services through the non-disclosure of material information, in violation of the mail-fraud statute (18 U.S.C. §§ 1341 and 1346), the government must prove that the defendant violated a disclosure duty imposed by state law." 129 S.Ct. at 2863.

Finnman is not, and at no time relevant to the charges against him was he, a state official. Thus, this question has no direct application to him.

---

[5] *Skilling* was argued before the Supreme Court on March 1, 2010, after Finnman filed his motion. *See Skilling v. United States*, No. 08-1394 docket (available at http://www.supremecourt.gov/Search.aspx?FileName=/docketfiles/08-1394.htm).

Arguably, the question presented in *Weyhrauch* might have some relevance to the aiding and abetting aspect of the charges against Finnman, *i.e.* the allegation–which the jury found to have been proven–that Finnman aided and abetted Charles Schwab (who at all relevant times was the Town Assessor for the Town of Greece, New York) in depriving the taxpayers of the Town of Greece of Schwab's honest services. Even if the Supreme Court were to hold in *Weyhrauch* that the government must prove that a state-official defendant violated a disclosure duty imposed by state law, however, that requirement would have been satisfied in this case.

At trial, there was testimony from Kathryn Firkins, the Director of Constituent Services for the Town of Greece.[6] She testified about a number of matters, including Schwab's disclosure requirements. As Firkins explained, Schwab was required to submit annually a financial disclosure form to the Town, "because as far as public officials, we need to disclose if there are any conflicts of interest." Dkt. #498 at 33. In response to hypothetical questions, Firkins further testified to the effect that Schwab should have disclosed on that form his association with Advanced Business Valuation Services ("ABVS"), which, as charged in the indictment, was an offshore company started by Schwab and Finnman, the purpose of which was to conceal the funds that they received from Nicolo in the course of their illegal scheme. *See* Indictment (Dkt. #70) ¶¶ 13-16; Firkins Tr. (Dkt. #498) at 35-36.[7]

---

[6]Firkins testified that her duties in that position included matters related to finance and accounting, borrowing for large scale capital projects, and other responsibilities. Dkt. #497 at 162-63.

[7]The specific question on which the Supreme Court granted certiorari in *Weyhrauch* was whether, where the federal § 1346 prosecution charges that services rendered by the official were not "honest," the government must prove that the state official violated state law, not simply

(continued...)

In *Black*, the Court has granted certiorari on two questions, one of which involves review of alleged instructional error, which plainly has no relevance to this case. The other question in *Black* is "[w]hether 18 U.S.C. § 1346 applies to the conduct of a private individual whose alleged 'scheme to defraud' did not contemplate economic or other property harm to the private party to whom honest services were owed."

As in *Weyhrauch*, the Supreme Court's answer to that question would have no effect on Finnman's conviction, regardless of whether the Court answers it in the affirmative or the negative. Economic harm, both contemplated and actual, was both charged and proven here.

Count 1 charged that the defendants engaged in a conspiracy, which had among its objects to "obtain[] money and property from Kodak ... ." Dkt. #70 at 14. It further charged that Finnman,

---

[7](...continued)
because a bribe or kickback was paid or because the official was operating under a conflict of interest, but because the official failed to *disclose* relevant information to the public employer. 2009 WL 797581, at *15.

In the case at bar, Firkins testified that Schwab's duty to submit the financial disclosure form "[wa]s a town requirement." Dkt. #498 at 35. While § 803 of the New York General Municipal Law does require a municipal officer to disclose to the municipality any "interest in any actual or proposed contract, purchase agreement, lease agreement or other agreement, including oral agreements, with the municipality of which he or she is an officer or employee," on its face that statute does not appear to apply to Schwab's interest in ABVS, which itself never entered into any contracts or agreements with the Town of Greece.

It seems apparent, however, that the reason that the petition for certiorari in *Weyhrauch* was phrased in terms of *state* law was because the defendant in that case was a state official, specifically a representative in the Alaska state legislature. *See* 2009 WL 797581, at *6. The issue before the Supreme Court in *Weyhrauch* is whether § 1346 "provides a mandate for the creation of a *federal* common law of disclosure obligations of state and local public officials concerning claimed conflicts of interest," even if no such disclosure obligations are imposed by state or local law. *Id.* at *11. Thus, the fact that Schwab's disclosure requirement arose under local rather than state law is of no moment here. The salient point is that the requirement is *not* one that arises only, if at all, under federal law.

on behalf of his employers Kodak and Global Crossing, caused Nicolo to be hired to perform appraisal services for those two companies, and that a portion of the monies paid out by Kodak and Global Crossing for those purported services was returned to Finnman by Nicolo and Schwab as kickbacks. *Id.* at 15. The indictment alleges that had Kodak and Global Crossing known of those payments, "they would have changed their conduct and not condoned the enrichment to Finnman." *Id.* at 16. In other words, they would not have paid money to Nicolo had they known that the money was ultimately lining Finnman's pockets.

The indictment further alleged that the defendants "obtained money from Kodak and Global Crossing by causing Nicolo to be paid unwarranted and unnecessary fees with respect to certain contracts Nicolo had with Kodak and Global Crossing." *Id.* at 17. It could hardly be any clearer, then, that the indictment here alleged a scheme that contemplated economic harm to the private parties to whom Finnman owed his honest services.

At trial in this case, the jury was fully instructed on those aspects of the charges. The Court recited the charges, including the alleged objects of the conspiracy, as well as the allegation that "Mr. Finnman obtained money from Kodak and Global Crossing [by way of kickbacks from Nicolo] by causing Mr. Nicolo to be paid unwarranted and unnecessary fees ... ." Dkt. #530 at 20.[8] Since the

_____

[8]In addition, the Court instructed the jury that "to show that a misrepresentation or omission was material, the Government does not need to prove that the employer actually suffered an economic harm or that the defendant intended to cause economic harm to the employer," but added that "where it is reasonably foreseeable that the scheme could cause some economic or pecuniary harm to the employer, the misrepresentation is material because in such a case, the employer's knowledge of the scheme would tend to cause the employer to change its behavior." Dkt. #530 at 49-50. Given the proof here, it was clearly more than just foreseeable that Finnman's employers might suffer some economic harm as a result of the scheme; that was one of the objects of the scheme, insofar as defendants intended to cause Kodak and Global

(continued...)

jury found that all of the alleged objects of the scheme had been proven as to Finnman, *see* Verdict Form (Dkt. #300) at 3-4, they implicitly found that Finnman engaged in a scheme that contemplated economic harm to his employers.

That the question presented in *Black* has no bearing on Finnman's conviction is further illustrated by the factual context in which the question in *Black* arose. As the intermediate appellate court in *Black* explained, the defendants in that case, who were senior executives of a corporation, "d[id] not deny that they sought a private gain," but they contended that it was intended to be a gain at the expense not of their employer, but of the Canadian government, to which they did not owe any services at all. *United States v. Black*, 530 F.3d 596, 600 (7th Cir. 2008). No analog to that fact pattern, or to those issues, is presented in the case at bar.[9]

In the third case before the Supreme Court, *Skilling*, two questions are presented. As in *Black*, one of the questions is completely irrelevant to Finnman's appeal, as it relates to issues involving jury prejudice arising from "the widespread community impact" and "massive, inflammatory pretrial publicity" concerning the Enron scandal. 2009 WL 1339243, at *I.

The second question in *Skilling* is whether § 1346 "requires the government to prove that the defendant's conduct was intended to achieve 'private gain' rather than to advance the employer's interests, and, if not, whether § 1346 is unconstitutionally vague." *Id.* Also as in *Black*, that question in *Skilling* arose in the context of facts vastly different from those in the instant case. The

_____

[8](...continued)
Crossing to pay unnecessary or inflated fees.

[9]The defendants in *Black* also contended that the Canadian government had willingly incurred that expense, and that their actions did not violate Canadian law. 530 F.3d at 601.

defendant in *Skilling* was the former CEO of Enron, and he contended that his conduct did not breach his fiduciary duty to Enron, because his fraudulent activities were undertaken in Enron's corporate interest, and because he had acted not for private gain, but in pursuit of Enron's goals of achieving a higher stock price. *United States v. Skilling*, 554 F.3d 529, 545 (5th Cir. 2009). Again, no similar facts or issues are present in this case, where it is clear that the defendants' private gain, not some perceived interest of Kodak, Global Crossing, or some other entity, was the overarching goal of the scheme.

I am unpersuaded by Finnman's arguments that, based on the comments of some of the justices on the Supreme Court, that Court appears "likely to address the general question of [§ 1346]'s constitutionality – rather than the narrow questions presented by the petitioners in *Black* and *Weyhrauch*." Lembke Decl. (Dkt. #563-2) ¶ 44. Such an assertion is purely speculative. The questions posed by members of a Court are poor barometers of the final decision of the Court. It is not the proper role of this Court to attempt to divine from what was said by this or that justice during oral argument whether the Supreme Court is likely to go beyond the questions on which it granted certiorari, and issue a more sweeping opinion addressing the general constitutionality of § 1346. At this point, all that can be said with any certainty is that the Supreme Court is considering the particular questions presented by the petitions for certiorari in *Black*, *Weyhrauch* and *Skilling*, none of which appear likely to have any effect on Finnman's convictions.

It is also worth noting that in *Weyhrauch*, the Supreme Court expressly *limited* the scope of the issues before it. In the petition for a writ of certiorari, the petitioner in *Weyhrauch* framed the question as whether § 1346 "mandates the creation by the federal courts of a federal common law

defining the disclosure obligations of state government officials." 2009 WL 797581, at *I. In granting the petition, the Supreme Court stated that its review was "limited to the following question: Whether, to convict a state official for depriving the public of its right to the defendant's honest services through the non-disclosure of material information, in violation of the mail-fraud statute, the government must prove that the defendant violated a disclosure duty imposed by state law." 129 S.Ct. 2863 (citation omitted). That question is clearly narrower in scope than the petitioner's original question.

Reinforcing the point, the Court also subsequently denied the petitioner's motion to modify the question presented in *Weyhrauch*. 130 S.Ct. 22 (July 27, 2009). Although the motion itself does not appear to be available online, the *Weyhrauch* petitioner's reply brief indicates that he sought to broaden the question presented to address the general issue of "whether there is constitutional authority for enactment of federal provisions requiring disclosures by state officials." 2009 WL 4874099, at *5. In denying that motion, then, the Court essentially declined the petitioner's invitation to consider broader, constitutional issues.

This Court will not engage in judicial augury by attempting to discern, from their questions or comments, what was on the minds of individual justices during argument of these three Supreme Court cases. *See United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985) ("the phrase 'likely to result in reversal or an order for a new trial' cannot reasonably be construed to require the district court to predict the probability of reversal. The federal courts are not to be put in the position of 'bookmakers' who trade on the probability of ultimate outcome"); *Jackson v. Maine*, 300 F.Supp.2d 197, 199 n.1 (D.Me. 2004) (stating, with respect to habeas petitioner's arguments based on Supreme

Court's grant of certiorari in another case, that "[t]he Supreme Court limited its grant of certiorari to Questions 1 and 2 presented by the petition for certiorari. Speculating whether the Supreme Court will even consider the *Apprendi* issue illustrates the danger of reading the grant or denial of certiorari like tea leaves") (citation omitted).

The short, but sufficient, answer to Finnman's arguments, then, is that the questions presented in *Black*, *Weyhrauch* and *Skilling* may be "substantial," but they are not likely to affect *Finnman*'s conviction or sentence. *Cf. United States v. Garnett*, No. 05-CR-20002, 2008 WL 2796098, at *4 (E.D.Mich. July 18, 2008) (stating, with respect to defendant's contention that Supreme Court's ruling in certain case that was pending at the time defendant filed his motion for bond pending appeal "might have far-reaching effects on his own appeal and would therefore establish a substantial question," that "[n]othing in the ... decision [appealed from in that other case] casts doubt on the constitutionality of federal regulations over the machineguns and silencers at issue in this case. Accordingly, Garnett has clearly failed to establish a substantial question that would satisfy 18 U.S.C. § 3143(b)(1)(B)"). Finnman's motion is therefore denied.[10]

---

[10]My conclusion that Finnman has failed to demonstrate the existence of a "substantial question" concerning his appeal renders it unnecessary for the Court to address Finnman's argument that, if the honest-services aspects of his case were dismissed, the only remaining charges would be time-barred.

**CONCLUSION**


The motions for release from custody pending appeal filed by defendants David Finnman

(Dkt. #563) and John Nicolo (Dkt. #566) are denied.

IT IS SO ORDERED.


_____
DAVID G. LARIMER
United States District Judge


Dated: Rochester, New York
       April 15, 2010.